# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HEATHER FLANEGAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-1379 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| OFFICER JOHN M. O'LEARY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

For the reasons that follow, Defendants' Motion to Dismiss (Doc. 7) will be granted.

**BACKGROUND**

Plaintiff has brought this Section 1983 action against police officer John M. O'Leary, the borough that employed him and his police chief, based on events that transpired during a traffic stop in December 2013. *See generally* Am. Compl. (Doc. 6). Plaintiff has explained the events that transpired, as she sees them, in a clear and unusually candid fashion. In relevant part, they are as follows.

Plaintiff was driving on a road with a posted speed limit of 35 miles-per-hour, when she "observed flashing lights on a vehicle following her. Plaintiff promptly pulled over into a Sunoco gas station under a light. Plaintiff turned on her interior lights, rolled her window half-way down and placed her hands in full view on the steering wheel until Officer O'Leary . . . approached." *Id.* at ¶¶ 7-9. "Officer O'Leary had a flashlight and approached Plaintiff's vehicle,

. . . which had several pro-Second Amendment stickers prominently displayed on the rear," and ordered her to roll her window all the way down, which she did. *Id.* at 9.[1]

Officer O'Leary asked Plaintiff if she had any weapons in the car, and Plaintiff responded that she did. *Id.* at ¶ 9. Officer O'Leary asked her where the weapon was located, and she responded that it "was on her door, holstered." *Id.* at ¶ 10. Officer O'Leary asked if the firearm was loaded, and Plaintiff responded in the affirmative. *Id.* He then demanded Plaintiff's gun license, driver's license, vehicle registration and proof of insurance. Plaintiff responded that some of the items were in her glove compartment, and he asked if she had any weapons in there, and Plaintiff responded that she did not. *Id.*

Plaintiff "leaned toward" her glove compartment to retrieve the items, and, as she did, Officer O'Leary opened her car door and seized the weapon from the driver's side compartment. *See id.* at ¶ 11. Plaintiff alleges to have been "shocked and instantly in fear for her physical safety," and she asked Officer O'Leary, "Sir, what are you doing?" *Id.* at ¶12. Officer O'Leary responded, "I would feel better if this [firearm] was with me while we conducted our business." *Id.*

Officer O'Leary departed for his police vehicle, taking Plaintiff's documentation and weapon with him. *Id.* at ¶ 16. He returned 33 minutes later, and issued Plaintiff a citation for exceeding the speed limit by 15 miles-per-hour, and he returned the firearm. *Id.*

---

[1] Plaintiff does not specify the time of day when the traffic stop occurred. *See generally id.* By every reasonable inference from the Amended Complaint, however, the stop transpired when the sun had gone partially or fully down. *See* quoted portions, *supra* (Plaintiff pulled into gas station "under a light," she "turned on her interior lights," and Officer O'Leary approached with "a flashlight"). To the extent that Plaintiff asserts or suggests that Officer O'Leary's decision to pull her over was influenced or caused by his having read with disfavor her Second Amendment bumper stickers, such a contention would raise serious, if not determinative, problems for her under *Iqbal/Twombly*. In any event, Plaintiff may proceed on the theory that Officer O'Leary was able to read the bumper stickers <u>after</u> she was pulled over, but, importantly, this distinction is immaterial to the legal analyses and conclusions herein.

Officer O'Leary stated, "[y]our gun is still loaded, I could not figure out how to open it." After the exchange of additional information and some mild unpleasantries (irrelevant to this case), Officer O'Leary closed the encounter, allegedly stating, "Hey, the more of you the merrier." *Id.* at ¶ 18.

Several months later, Plaintiff received notice of a summary trial for the citation, to be held before the local magisterial district judge. *Id.* at ¶ 21. Plaintiff appeared and "pleaded guilty to the citation." *Id.*

On these facts, Plaintiff has alleged violations of: the First Amendment, as relates to her bumper stickers in support of the right to bear arms (Count I); the Second Amendment, based on Officer O'Leary's seizure of her firearm during the traffic stop (Count II); the Fourth Amendment prohibition against unlawful searches and seizures (Count III); Plaintiff's equal protection rights, as a female, under the Fourteenth Amendment, based on Officer O'Leary's alleged "the more the merrier" comment (Count IV); and Plaintiff's purported "unlawful arrest" under the Fourth Amendment, resulting from the 33-minute traffic stop (erroneously labeled as second Count IV).[2] The Court will address each of these theories below, *in seriatim*.

## ANALYSIS

### A. The First Amendment

Plaintiff's First Amendment claim gains no traction. Even assuming Officer O'Leary saw Plaintiff's bumper stickers before deciding to pull her over (an inference of questionable plausibility, given other allegations in the Amended Complaint), Plaintiff's admission to having pleaded guilty to the traffic infraction rendered his intentions immaterial. U.S. v. Delfin-Colina,

---

[2] The last Count, Count V, purports to allege municipal liability against the borough and police chief. Because Plaintiff's underlying claims fail, so too do the municipal liability claims.

464 F.3d 392, 398 (3d Cir. 2006) (within context of traffic stops, "[s]ubjective intentions play no role in [the] probable-cause . . . analysis"; " [i]mproper motive . . . is irrelevant to the question whether the objective facts available to the officer[] at the time reasonably could have led the officer[] to conclude that [the cited party] was committing an offense") (citations to quoted sources now, and hereafter, omitted); *cf. also, e.g.*, U.S. v. Huff, 2010 WL 6500732, *9 (E.D. Tenn. Dec. 6, 2010) (declining invitation to "scrutinize [the officer's] true reasons for stopping [driver]," including "lettering and bumper stickers on [driver's] truck," because probable cause was "objectively grounded in both fact and law"). Plaintiff's guilty plea puts to rest any questions regarding probable cause, and, consequently, any inquiries into Officer O'Leary's subjective intent. His presumed anti-gun sentiments cannot form a basis for ethereal claims under the First Amendment, and if there is case law supporting Plaintiff's theory, she has failed to identify it.

Furthermore, within the context of traffic stops, the Court of Appeals for the Third Circuit has expressly cautioned against "allowing a [First Amendment] retaliation claim against a police officer to proceed to [a jury]," because "officers should not by reason of potential civil liability be discouraged from intervening when their services are needed." McCann v. Winslow Twp., 2008 WL 4900392, *3 (3d Cir. Nov. 17, 2008) (citing "[the] potential chilling effect if causation requirements [regarding First Amendment retaliation] are not [rigorously] enforced"). Where, as here, probable cause is not in dispute, the law strongly disfavors allowing a claim to proceed under the First Amendment.[3]

---

[3] While, admittedly, McCann was decided on summary judgment, it remains persuasive under the circumstances because nothing revealed through discovery could undermine the conclusions above, including Plaintiff's admission to probable cause. *See* Walker v. Clearfield Cnty. Dist. Atty., 2011 WL 213475, *483 (3d Cir. Jan. 24, 2011) (within context of Section 1983, "a guilty plea -- even one for a lesser offense -- does not permit a later assertion of no probable cause");

Finally, even assuming Plaintiff's First Amendment claim could survive the above analyses, it promptly would fail under the doctrine of qualified immunity. *See* <u>Reichle v. Howards</u>, -- U.S. --, 132 S. Ct. 2088, 2094 & n.5 (2012) (Supreme Court "never has held that there is . . . a right" to be "free from a [First-Amendment] retaliatory arrest that is otherwise supported by probable cause"; *Whren's* "discussion of the Fourteenth Amendment does not indicate, much less clearly establish, that an arrest supported by probable cause could nonetheless violate the First Amendment").

Under the circumstances presented, Plaintiff does not assert a viable First Amendment claim.

**B.      Seizure of Plaintiff's Firearm, Under the Second and Fourth Amendments**

The temporary dispossession of Plaintiff's firearm, for the duration of the traffic stop, is inactionable. The Supreme Court has long recognized

> . . . the inordinate risk confronting an officer as he approaches a person seated in an automobile. According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. . . . We are aware that not all these assaults occur when issuing traffic summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. . . . Indeed, it appears that a significant percentage of murders of police officers occurs when the officers are making traffic stops.

<u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 110 (1977) (citation to quoted sources omitted).

Viewed through this prism, it is hardly surprising that longstanding, unanimous precedent supports an officer's temporary seizure of firearms for the duration of his or her investigation. <u>U.S. v. Malachesen</u>, 597 F.2d 1232, 1234-35 (8th Cir. 1979) (even absent apparent threat or

---

*compare also* Am. Compl. at ¶ 21 ("Plaintiff . . . pleaded guilty to the citation") *with* <u>Judon v. Travelers Property Cas. Co. of Amer.</u>, 773 F.3d 495, 503 n.6 (3d Cir. 2014) ("facts expressly conceded in a complaint constitute judicial admissions").

5

incrimination, "temporary seizure [of a firearm], unloading, and retention by a responsible officer . . . [is] a reasonable precaution to assure the safety of all persons"; "[c]ommon sense dictates that the weapon should be unloaded and, at least temporarily, kept in a safe place"); U.S. v. Koepnick, 2011 WL 134102, *1 (9th Cir. Jan. 13, 2011) ("[e]ven if . . . [there is no] probable cause to believe the gun was illegal, it was still a gun," and "[e]very circuit to confront [the] question" has approved "[the] temporary seizure of [a] gun as a reasonable safety precaution"); *accord* U.S. v. Pillow, 842 F.2d 1001, 1004 (8th Cir. 1988) (same); Kelly v. City of Oak Park, 2014 WL 4829601, *4 (E.D. Mich. Sept. 29, 2014) ("the paramount concern of officer safety clearly justified [a] temporary seizure of the firearm") (emphasis added); Baker v. Schwarb, 40 F. Supp.3d 881, 892-93 (E.D. Mich. 2014) ("[w]eapons cause unique concerns for the safety of the public and the police," and police officers may "seize plaintiff's weapon and ammunition for their own safety while they" conduct investigation); U.S. v. Menjivar, 2011 WL 10647325, *5 (N.D. Ga. Nov. 29, 2011) (numerous courts "have recognized that objects dangerous in themselves, such as handguns, may constitutionally be seized, at least temporarily"); U.S. v. Lopez-Sanchez, 2011 WL 3422836, *10 (N.D. Ind. Aug. 4, 2011) ("[g]iven that a shotgun is a dangerous weapon no matter the length of its barrel, it seems inarguable that removing the shotgun from the truck during the duration of the search and ensuring that it was unloaded would be reasonable precautions to ensure the safety of officers as they searched"); *compare also* U.S. v. Reynolds, 2009 WL 1090674, *10 (D. Me. Apr. 21, 2009) ("[T]emporary seizure of the guns was reasonable, and did not violate [plaintiff's constitutional] rights," as officer was not required to believe plaintiff "that the guns were unloaded," and he was "further entitled to suspect that his safety would be needlessly jeopardized if he were to turn his back on [plaintiff] with the guns close at hand. By temporarily seizing the guns, he assured that

6

<u>the remainder of his investigation</u> . . . <u>could be conducted under peaceful circumstances</u>.") (emphasis added) *with* Am. Comp. at ¶ 12 (Officer O'Leary told Plaintiff, "I would feel better if this [firearm] was with me while we conducted our business").

Similarly, the Supreme Court's approval of police officers requiring drivers to exit their vehicle during traffic stops is founded, in large part, on concerns regarding the driver's potential access to dangerous weapons. <u>N.Y. v. Class</u>, 475 U.S. 106, 115-16 (1986) ("[w]hile we impute to respondent no propensity for violence," "out of a concern for the safety of the police, the Court has held that officers may, consistent with the [Constitution], exercise their discretion to require a driver who commits a traffic violation to exit the vehicle <u>even though they lack any particularized reason for believing the driver possesses a weapon</u>") (emphasis added) (citing <u>Mimms</u>). The same concerns are implicit in officers' ability to question drivers regarding the presence of a dangerous weapon. <u>U.S. v. Everett</u>, 601 F.3d 484, 494-95 (6th Cir. 2010) ("there has been widespread agreement . . . that officers conducting a traffic stop may inquire about dangerous weapons," and in light of <u>Mimms</u>'s approval of requiring driver to exit vehicle, "it would be irrational to conclude that officers cannot take the less intrusive [measure] of . . . asking whether a driver has a gun"). These constitutionally-approved safeguards are necessary antecedents to the conclusion that, upon learning of the presence of a dangerous weapon in his or her presence, an officer temporarily may secure the weapon until the investigation is completed. *See* discussions *supra*.

In the face of this precedent, Plaintiff's grievances regarding Officer O'Leary's temporary seizure of her weapon, whether under the Second or Fourth Amendments, are untenable. Her ability to state a viable Second Amendment claim further is diminished.

To begin with, there is significant doubt as to whether Second Amendment protections extend as far as Plaintiff and her counsel appear to believe. Many courts have declined to read *Heller* as extending the right to bear arms to outside the home, and others have held that it does not bestow upon individuals the right to possess a specific gun. *See, e.g.*, Hopkins v. Claroni, 2015 WL 2371654, *7 (D. Me. May 18, 2015) (noting recent circuit court decision "declin[ing] to extend the right to keep and bear arms beyond defense of hearth and home," and holding that "there is no Second Amendment issue presented by the seizure of a particular firearm"); Vaher v. Town of Orangetown, 916 F. Supp.2d 404, 429-30 (S.D.N.Y. Jan. 2, 2013) ("the 'right to bear arms' is not a right to hold some particular gun"); Baker, 40 F. Supp.3d at 894 (holding same, and quoting Supreme Court's statement in *McDonald* that, "[l]ike most rights, the Second Amendment right is not unlimited," and "[i]t is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"). Even those courts willing to indulge alternate hypothetical scenarios (in *dicta*, and after finding no Second Amendment violation) have focused on the <u>return</u> of a lawfully seized weapon, not the actual (let alone temporary) seizure of the weapon itself. *See, e.g.*, Walters v. Wolf, 660 F.3d 307, 317-18 (8th Cir. 2011) (rejecting Second Amendment claim in case before it, but declining to foreclose future claims "seek[ing] a meaningful procedural mechanism for return of [a] lawfully seized firearm"); Sutterfield v. City of Milwaukee, 751 F.3d 542, 572 (7th Cir. 2014) (emphasizing that defendant had "a procedure by which a citizen whose lawfully-possessed gun ha[d] been seized may seek its return," and stating: "Beyond a bare-boned contention that the seizure violated her Second Amendment rights, [plaintiff had] not developed a cogent argument as to the reach and application of the Second Amendment in the law enforcement and community caretaking context. <u>The issue is a sensitive one</u>, as it implicates not only the individual's right to possess a

8

firearm, <u>but the ability of the police to take appropriate action when they are confronted with a firearm that may or may not be lawfully possessed, and which, irrespective of the owner's right to possess the firearm, may pose a danger to the owner or others</u>.") (emphasis added), *cert. denied*, -- U.S. --, 135 S. Ct. 478 (2014).

For its part, the Court of Appeals for the Third Circuit has declined to resolve whether Second Amendment protections extend beyond the right to bear arms at home, for self defense. <u>Drake v. Filko</u>, 724 F.3d 426, 431 (3d Cir. 2013). This Court is confident, however, that the Second Amendment will not, in the future, be read so broadly as to bestow upon the citizenry a constitutional right to remain "armed and loaded" while police officers perform essential investigatory functions in their presence. Fourth Amendment jurisprudence, regarding the prohibition against unlawful searches and seizures, presents a well-established, and frankly better, framework for determining an individual's rights during such investigative activities, and the law in that area makes clear that officer-safety is of "paramount concern." *See* discussions *supra*.

Finally, it should be readily apparent that, were any claim under the Second Amendment be allowed to proceed here, it immediately would fail under the doctrine of qualified immunity. *See, e.g.*, <u>Sutterfield</u> at 571-72 (affirming entry of summary judgment on same basis); <u>Meeks v. Larsen</u>, 2015 WL 2056346, *7-8 (6th Cir. May 5, 2015) (declining to extend Second Amendment rights to *Bivens*-context, and affirming district court's dismissal of claims under Rule 12(b)(6) based on qualified immunity); <u>Nichols v. Brown</u>, 945 F. Supp.2d 1079, 1098-1101 (C.D. Cal. Mar. 3, 2013) (dismissal at 12(b)(6) stage, on qualified immunity grounds); <u>Vaher</u>, 916 F. Supp.2d at 428-30 (same).

For all of these reasons, Plaintiff's Second Amendment claim must fail.

9

## C. Equal Protection

The Court quickly may dispose of Plaintiff's gender-based claim. She posits that Officer O'Leary's alleged statement, "the more of you the merrier," possibly referred to her protected status as a woman. *See* discussion *supra*. This contention is illogical on its face. Presumably, Officer O'Leary has confronted the existence of females in society, whether a mother, wife, daughter or otherwise, and it strains credulity to believe that he meant, the more persons of a population equaling roughly 50.8% of the American public,[4] the merrier. Even before *Iqbal/Twomby*, the Court was not constrained to accept such fanciful reasoning, and it most certainly is not now. *See* <u>Curay-Cramer v. Ursuline Academy of Wilmington, De., Inc.</u>, 450 F.3d 130, 133 (3d Cir. 2006) (even pre-*Iqbal/Twombly*, courts "need not credit [a pleader's] . . . <u>unreasonable factual inferences</u>") (emphasis added); <u>Knit With v. Knitting Fever, Inc.</u>, 2015 WL 5147749, *5 n.10 (3d Cir. Sept. 2, 2015) ("the pleading's factual content must independently permit the court to infer <u>more than the mere possibility of misconduct</u>") (emphasis added); <u>Johnson v. Cash</u>, 557 Fed. Appx. 102, 104 n.3 (3d Cir. Oct. 11, 2013) (complaint must contain more than "naked assertions devoid of further factual enhancement").

Plaintiff's Equal Protection claim is without merit.

## D. "Unlawful Arrest" Based on 33-Minute Traffic Stop

Last is Plaintiff's claim for unlawful arrest. This claim boils down to Plaintiff's dissatisfaction with it having taken too long, in her mind, for Officer O'Leary to execute the traffic citation. Plaintiff's counsel acknowledges the processes that a Pennsylvania citizen can, by statute, be expected to endure. *See* Pl.'s Opp'n Br. (Doc. 10) at 10 (citing 75 Pa. Stat.

---

[4] *See* United States Census Bureau's webpage, http://quickfacts.census.gov/qfd/states/00000.html.

§ 6308). These include: checking the vehicle's registration; proof of financial responsibility; vehicle identification number; engine number; the driver's license; and "secur[ing] such other information as the officer may reasonably believe to be necessary to enforce" the traffic laws. *Id.* at § 6308(b). While these state-rules obviously do not define the scope of constitutionality, Plaintiff appears to accept them as reasonable.

The Court does not know how long Plaintiff or her counsel believes these procedures should have taken, but it seems reasonable to believe that fifteen minutes would be a good estimate. So the question is, should Plaintiff be permitted to maintain a federal lawsuit based on the roughly 18-minutes of extra inconvenience presumably suffered at the hands of Officer O'Leary. The law says not.

In the first instance, the Court seriously doubts that Plaintiff's 33-minute "detention" constitutes a *de facto* arrest. A strong line of precedent in the Third Circuit would answer, hardly not. *See* U.S. v. Goode, 2012 WL 2511318, *3 (3d Cir. Jul. 2, 2012) (finding insufficient reason to convert investigatory stop to *de facto* arrest, even where "officers surround[ed] a car with their weapons drawn, shout[ed] at the occupants and later handcuff[ed] them") (relying on U.S. v. Johnson, 592 F.3d 442, 447–48 (3d Cir. 2010)). Under this line of reasoning, Plaintiff's claim fails.[5]

Plaintiff would urge the Court to shift focus, however, to a line of cases holding that an investigative stop, unreasonable in scope and breadth, can automatically convert into a *de facto*

---

[5] Even absent this conclusion, the Court will not blithely accept the notion that allegations of minutes-of-delay, alone, can be sufficient to support a plausible claim for *de facto* arrest. *See* U.S. v. Leal, 2007 WL 1655658, *3 (3d Cir. Jun. 8, 2007) (in determining whether *de facto* arrest occurred, court must consider not only duration of stop, but "the law enforcement purposes justifying the stop, whether the police diligently sought to carry out those purposes given the circumstances, and alternative means by which the police could have served their purposes"); Keough v. Packard, 2014 WL 4627193, *10 (D. Colo. Sept. 15, 2014) ("the length of detention alone" cannot establish *de facto* arrest).

11

arrest. What Plaintiff's argument fails to appreciate, however, is that those decisions ultimately addressed the level of suspicion required to warrant the intrusion in question. These issues most often arise within the context of evidence-suppression, in criminal cases, and the consequence of a conversion to "*de facto* arrest" is the demand for probable cause. *See, e.g.*, Murphy v. Mifflin Cnty. Reg'l Police Dept., 548 Fed. Appx. 778, 781 (3d Cir. Dec. 16, 2013) (rejecting argument that investigative seizure converted to "arrest requiring probable cause") (emphasis added); Leal, 2007 WL 1655658 at *4 ("a *Terry* stop must be limited in duration," and "a more lengthy detention must be based on . . . probable cause") (emphasis added); Davila v. N. Reg'l Joint Police Bd., 979 F. Supp.2d 612, 629 (W.D. Pa. 2013) (allowing plaintiff to survive dismissal because, if officer "did not have probable cause at the time he [*de facto*] arrested [plaintiff]," constitutional claim may proceed), *vacated in part on other grounds*, 2014 WL 3735631 (W.D. Pa. Jul. 28, 2014); Hall v. Raech, 677 F. Supp.2d 784, 793 (E.D. Pa. Jan. 7, 2010) (same).

In this case, the existence of probable cause is not disputed, and the aforementioned line of cases is inapposite. Once the issue of probable cause is implicated, moreover, Plaintiff's claim promptly succumbs to the *Heck* bar. *See* Mosby v. O'Brie, 532 Fed. Appx. 84, 86 (3d Cir. Jul. 29, 2013) (false arrest claim may be maintained under *Heck* without showing a favorable determination, "but only if it does not necessarily implicate the validity of a conviction or sentence").[6]

---

[6] Even were the "false arrest" claim not to fail under the myriad reasons identified above, Plaintiff's claimed injury appears *de minimis*, at best. "A claim for false arrest . . . covers damages only for the time of detention until the issuance of [further] process. . ., and not more." Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998). In this case, Plaintiff's period of "detention" ran no longer than 33 minutes -- minus the time she and her counsel believe would have been reasonable for Officer O'Leary to fulfill his investigative responsibilities. This scenario brings to mind the adage, "don't make a federal case . . . ."

12

**CONCLUSION**

In closing, the Court questions not the sincerity of Plaintiff's umbrage with having been dispossessed of her firearm for 33-minutes during a traffic stop. While Plaintiff enjoyed the benefit of knowing she had no intention of using her weapon, Officer O'Leary did not. Absent powers of clairvoyance, he could not read Plaintiff's thoughts. As both a matter of common sense and the law, it appears abundantly reasonable, and apt, for Officer O'Leary to have responded, as he allegedly did, "I would feel better if this [firearm] was with me while we conducted our business."

While views regarding the Second Amendment fairly may be characterized as expanding as of late, there currently exists no basis for concluding that such rights extend to a gun owner keeping possession of a loaded firearm, within hand's reach, in the immediate vicinity of a police officer conducting investigative duties. This is, no doubt, of great relief to law enforcement agents, who every day place their lives on the line to provide invaluable, if dangerous, services for the protection of the public.

For all of the reasons stated above, the Court hereby enters the following:

**II. ORDER**

Defendants' Motion to Dismiss (**Doc. 7**) is **GRANTED**, and this case is **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED.

September 11, 2015    s\Cathy Bissoon
                     Cathy Bissoon
                     United States District Judge

cc (via ECF email notification):

All counsel of record